**Affirm in part; Reverse and Remand in part; Opinion Filed August 15, 2013.**



**In The**
**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-12-00207-CV**

**RANDALL LEE HALER, Appellant**
**V.**
**BOYINGTON CAPITAL GROUP, INC., Appellee**

**On Appeal from the 429th Judicial District Court**
**Collin County, Texas**
**Trial Court Cause No. 429-02144-06**

## OPINION

Before Justices Moseley, Bridges, and Lang-Miers
Opinion by Justice Moseley

Appellee Boyington Capital Group, Inc. sued appellant Randall Lee Haler asserting a number of causes of action. A jury found in Boyington's favor on its theories of fraud, fraudulent inducement, fraud by non-disclosure, conversion, breach of fiduciary duty, conspiracy, and breach of the Texas Theft Liability Act (TTLA) and the Texas Deceptive Trade Practices Act. Under each theory, the jury found the same amount of actual damages—$258,021.73. The trial court signed a judgment awarding to Boyington that amount, as well as interest, attorney's fees, and court costs.

Haler brings thirteen issues on appeal. He argues, among other things, the trial court erred by: (1) entering judgment on Boyington's TTLA claim; (2) entering judgment that Haler was liable because the liability portion of the relevant jury questions are worded in the disjunctive; (3) awarding attorney's fees; and (4) entering judgment for the full amount of the

verdict because the jury found Haler was only 49 percent liable for the damages. For the reasons that follow, we affirm the trial court's judgment in part and reverse and remand in part.

**BACKGROUND**

Haler was the Executive Vice President of McKinney Aerospace, LP, a company that repaired airplanes. He also was a forty-nine percent limited partner in McKinney Aerospace. His partner, Andrew Eros, also owned a forty-nine percent limited partnership interest in McKinney Aerospace. Aeros Aviation, LLC was the general partner.

Haler testified his duty as Executive Vice President was to be the company's software engineer. He also "walked around the floor and just tried to help remove stumbling blocks for getting things done," but he did not know anything about repairing airplanes. Although he handled day-to-day operations and made sure jobs were completed, he was not responsible for the business side of the operation. The company's Chief Financial Officer reported to Haler.

Boyington owned an airplane that required extensive repairs so that Boyington could operate it commercially as a charter plane. Boyington's principal, Greg Morse, engaged McKinney Aerospace to do the repair work. The parties entered into four contracts.

Before entering into the contracts with McKinney Aerospace, Morse spent a lot of time getting to know Haler and Eros. Morse testified:

> Mr. Haler expressed to us on a number of occasions, eye-to-eye, first person, that he owned half of McKinney Aerospace, two, that he controlled the money, three, that they were in very fine legally financial shape, four, that if we gave them the work, because I asked a number of very important questions, they had plenty of cash to operate their business during the term that they were working on our airplane.
> That's the synopsis of what we covered literally dozens of times over the weeks and months leading up to the date of the signing of the contract and the subsequent delivery of the airplane to Mr. Haler at McKinney Aerospace.

Boyington entered into the contracts with McKinney Aerospace on March 31, 2006, and deposited $337,275 with McKinney Aerospace on April 7, 2006. After receiving the money

–2–

from Boyington, that day McKinney Aerospace paid off a $250,000 promissory note it owed to another entity.

Once Boyington's airplane arrived at McKinney Aerospace's facility, additional problems with it were identified. On behalf of Boyington, Morse agreed to the additional repair work and executed a change order for $60,000. Morse hand–delivered a $60,000 check to McKinney Aerospace on the morning of June 6, 2006. When he delivered the check, Morse intended McKinney Aerospace would continue to repair the airplane. However, later that day, Morse delivered a letter to Eros and Haler "regarding the mothball of the project." Morse's letter asked McKinney Aerospace to stop working on the project, return all parts that had been purchased but not installed for the plane, and refund monies received but not spent.

Morse testified that between the time he delivered the $60,000 check and the letter to mothball the project, "[w]e became aware of the fact that things at that point did not seem right . . . We understood that equipment - - we found out in a very short period of time that the equipment that we had contracted for, paid for, had been told had been bought from the manufacturer had not in fact been bought." McKinney Aerospace was supposed to have ordered several pieces of equipment that had not been ordered; Morse discovered that parts for Boyington's airplane were not at McKinney Aerospace's facility even though he had been told the parts had been ordered. Boyington decided to halt the project and investigate the situation at McKinney Aerospace. Morse testified:

> What we're saying is do not continue doing any work on the airplane. We want to pay you for what you have done, but we found many errors - - economic viability of continuing forward to restore this airplane to a [FAA] compliant condition is now in question.
> So whatever we spent so far we spent, and we want to pay you for that. But all of a sudden, things were starting to snowball out of control on a number of fronts from our perspective.
> And we did not want to go ahead and continually pump good dollars after what at that point could potentially have been bad dollars in an airplane that was potentially going to be economically upside down financially.

–3–

When Morse delivered the letter on June 6, he asked Haler to return the $60,000 that he delivered earlier that day. Haler told Morse that McKinney Aerospace did not have the $60,000, the money had already been spent. Subsequently, on June 12, 2006, Eros, on behalf of McKinney Aerospace, sent a letter to Morse stating McKinney Aerospace intended to return the $60,000 change order deposit check to Boyington "when McKinney Aerospace receives the deposit payment due against" some work that McKinney Aerospace was doing on a different airplane belonging to an unrelated party. Morse testified that the June 12, 2006 letter "told us that instead of being very financially solid, sound, and liquid, [McKinney Aerospace] didn't even have the $60,000 that we had given to them in the morning to give us back our own money."

Haler created a chart for Boyington showing the value of the repair contracts, the amount of money deposited on each of those contracts, and how much remained due if the contracts were completed. The available cash for the airplane repair, which had been deposited with McKinney Aerospace, was shown to be $258,021.73. Morse believed the $258,021.73 number was too low. He discussed his concern with Haler who said he would get back to Morse and that McKinney Aerospace would refund Boyington's money that had not been spent repairing the plane, even though McKinney Aerospace was low on cash.

On June 19, 2006, McKinney Aerospace wrote a letter to Boyington stating the total amount owed to Boyington was $158,000. The change order credit was listed at $42,894.07, even though no work was done on the change order. Although the letter proposed a pay-out schedule, no payments were ever made.

Morse testified he ordered McKinney Aerospace to stop working on the airplane because "they stole our money and weren't using it correctly" and because of the "maintenance recommendations or the aircraft evaluation made by McKinney Aerospace," meaning repairing the airplane was economically unsound. However, Haler testified that McKinney Aerospace had

–4–

sufficient funds to continue working on the plane and, if work had not been stopped, the plane would have been finished in six weeks. Eventually, the plane was sent to a salvage yard.

On September 20, 2006, after this lawsuit was filed, the trial judge appointed a receiver for McKinney Aerospace. The receiver's report was read to the jury at trial. The report stated:

Based on our limited review, we made an estimate of revenues and disbursements for 2005 and 2006 [for McKinney Aerospace]. The results are the following estimates:

| 2006 | 2005 | ($ in millions) |
|---|---|---|
| $5.3 | $17.2 | Gross Receipts |
| $6.4 | $17.4 | Disbursements |
| **<$1.1>** | **<$0.2>** | **Loss** |

The report also stated that McKinney Aerospace was shut down and began liquidating in in July 2006, nearly all of McKinney Aerospace's employees were terminated at the end of July 2006, and the operating equipment was sold by August 15, 2006. McKinney Aerospace subsequently filed a voluntary petition for Chapter 11 bankruptcy protection. The petition listed its assets as $0 to $10,000, and its estimated liabilities at $1 million to $100 million.

## STANDARD OF REVIEW

When, as here, an appellant attacks the legal sufficiency of an adverse finding on an issue on which he did not have the burden of proof, he must demonstrate that no evidence supports the finding. *Doyle v. Kontemporary Builders, Inc.*, 370 S.W.3d 448, 453 (Tex. App.—Dallas 2012, pet. denied) (citing *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex. 1983)). There is "no evidence" when (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d) the evidence conclusively establishes the opposite of the vital fact. *See City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005). "The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *Id.* at

827. We review the evidence in the light most favorable to the verdict, crediting favorable evidence if reasonable jurors could and disregarding contrary evidence unless reasonable jurors could not. *See id.* at 820-21.

**LAW AND ANALYSIS**

## A. Texas Theft Liability Act

In his fifth issue, Haler asserts the trial court erred by entering judgment on Boyington's TTLA claim because: (1) the jury answered Haler was not in control of McKinney Aerospace, precluding Haler from exercising control over Boyington's unearned deposits; (2) there was no evidence or insufficient evidence that Haler intended to deprive Boyington of its money at the time Boyington paid it to McKinney Aerospace; and (3) there was no evidence or insufficient evidence that Haler used deception to have Boyington consent to send money to McKinney Aerospace.

Under the TTLA, a person who commits theft—which includes the unlawful appropriation of property under section 31.03 of the Penal Code—is liable for the damages resulting from the theft. TEX. CIV. PRAC. & REM.CODE ANN. §§ 134.002, 134.003 (West 2011). A theft occurs when (1) property is (2) unlawfully appropriated (3) by someone (4) with intent to deprive the owner of that property. TEX. PENAL CODE ANN. § 31.03 (West Supp. 2012). Property includes money, *see id.* § 31.01(5)(C) (West Supp. 2011); "appropriate" means to "acquire or otherwise exercise control over property other than real property," *id.* § 31.01(4). A person who sustains damages resulting from the unlawful appropriation of property may recover actual damages, as well as additional damages not to exceed $1,000 and attorney's fees. TEX. CIV. PRAC. & REM. CODE ANN. § 134.005.

Haler has not demonstrated there is no evidence supporting the jury's finding that he violated the TTLA. The jury heard evidence that Boyington transferred money to McKinney Aerospace only after Haler told Boyington "on a number of occasions, eye-to-eye, first person, that he owned half of McKinney Aerospace, two, that he controlled the money, three, that they were in very fine legally financial shape, four, that if we gave them the work, because [Morse] asked a number of very important questions, they had plenty of cash to operate their business during the term that they were working on our airplane." The jury also heard evidence from which it could conclude McKinney Aerospace was not financially sound and lacked sufficient funds to operate its business during the time it worked on Boyington's airplane, and Haler's statements to the contrary were untrue. Morse testified that McKinney Aerospace "stole our money and [wasn't] using it correctly," the receiver's report showed McKinney Aerospace ran deficits during 2005 and 2006, McKinney Aerospace shut down its operations shortly after Boyington mothballed its project, McKinney Aerospace filed a voluntary petition for Chapter 11 bankruptcy protection, and the bankruptcy petition listed assets between $0 and $10,000 with liabilities between $1 million and $100 million.

The jury also heard evidence from which it could have concluded that McKinney Aerospace misdirected and misused funds it received from Boyington, that McKinney Aerospace used money from Boyington to pay its debts rather than to perform the work on Boyington's plane. The same day McKinney Aerospace received $337,275 from Boyington, it transferred $250,000 to pay off a debt; had McKinney Aerospace not received the money from Boyington—which Boyington believed would be used to repair its airplane—McKinney Aerospace could not have paid the debt. Likewise, Boyington presented evidence that McKinney Aerospace spent the $60,000 check delivered on June 6, 2006, on the same day it was received; however, there was no evidence that any of the $60,000 was spent on Boyington's plane.

From this evidence, a jury could conclude that, by misrepresenting the financial condition of McKinney Aerospace and spending money it received from Boyington on payments other than those related to repairing Boyington's plane, Haler unlawfully appropriated Boyington's property with the intent to deprive Boyington of its money. *See* TEX. PENAL CODE ANN. § 31.03.

Haler argues that because the jury found he did not participate in control of McKinney Aerospace, he could not have exercised control over McKinney Aerospace's failure to refund any funds due to Boyington, and, therefore, we must reverse the jury's finding that he violated the TTLA. We disagree. The jury heard evidence that McKinney Aerospace's Chief Financial Officer reported to Haler; Haler told Morse he "controlled the money;" Haler knew the $60,000 had been spent on the same day it was received; and Haler created a chart for Boyington showing the value of the contracts, the money deposited on each contract, and the available cash for the airplane repair—258,021.73. From this evidence, the jury could have concluded that Haler did not control McKinney Aerospace, but that he did exercise enough control over McKinney Aerospace's finances to unlawfully appropriate Boyington's money. Further, the jury's finding that Haler violated the TTLA could be based on facts other than McKinney Aerospace's failure to refund Boyington's money after Boyington instructed McKinney Aerospace to stop work on the plane. The jury may have concluded Haler violated the TTLA when he acquired Boyington's money in April 2006, not when he failed to refund it in June 2006. Thus, even if we assume Haler lacked the ability to issue a refund to Boyington, that fact would not preclude the jury from concluding Haler violated the TTLA.

Even if we were to assume the jury's findings present a conflict, we have a duty to "harmonize jury findings when possible." *Arvizu v. Estate of Puckett*, 364 S.W.3d 273, 276 (Tex. 2012) (quoting *Producers Chem. Co. v. McKay*, 366 S.W.2d 220, 224 (Tex. 1963)). Our analysis above does just that.

–8–

Although there also is evidence in the record showing Haler did not control the money at McKinney Aerospace and McKinney Aerospace did have sufficient funds to operate its business and finish Boyington's aircraft if Boyington had not stopped work, we must review the evidence in the light most favorable to the verdict, crediting favorable evidence if reasonable jurors could and disregarding contrary evidence unless reasonable jurors could not. *See City of Keller v. Wilson*, 168 S.W.3d at 820-21. When applying that standard, we conclude Haler failed to show there is no evidence supporting the jury's finding. We overrule Haler's fifth issue.

### B. Disjunctive language

Jury question 7, the TTLA question, asked: "Do you find from the preponderance of the evidence that Randall Haler and/or Andrew Eros and/or McKinney Aerospace, LP and/or Aeros Aviation, LLC committed the offense of theft of property from Boyington . . . ." The jury charge contained blanks beside the name of each of the persons or entities inquired about; the jury filled in each blank with "yes."

In his ninth issue, Haler argues that the jury's answer should be disregarded because it does not "afford a reasonable basis upon which to enter a judgment." He asserts that, because of the disjunctive language used in the question, a trial court cannot tell from the jury's answer which facts apply to Haler or other responsible third parties in order to formulate a judgment against Haler.

The disjunctive language used in jury question 7 is the language Haler requested in his proposed jury charge submitted to the court. A party cannot ask something of the trial court and then complain that the court erred by granting the request. *See Tittizer v. Union Gas Corp.*, 171 S.W.3d 857, 861 (Tex. 2005) (citing *Northeast Tex. Motor Lines v. Hodges*, 138 Tex. 280, 158 S.W.2d 487, 488 (1942)). Likewise, if we assume without deciding that the charge was

erroneous, the doctrine of invited error provides that a party may not complain of an error which the party invited. *In re Dept. of Family & Protective Servs*., 273 S.W.3d 637, 646 (Tex. 2009); *Tittizer*, 171 S.W.3d at 862. Because Haler requested the language that he now complains about, we do not consider the merits of the alleged error Haler complains of in his ninth issue.

But even if we were to consider the merits of Haler's ninth issue, we would conclude the charge is sufficiently clear to allow the trial court to reasonably formulate a judgment. Jury question 7 asked the jury to determine whether any of the four parties listed—Haler, Eros, McKinney Aerospace, and/or Aeros Aviation—breached the TTLA. The jury could have found that none of the parties did, one or more of them did, or all of them did. The jury decided that the four parties listed breached the TTLA and the trial court could enter judgment accordingly. Thus, it is clear the jury determined Haler, as well as Eros, McKinney Aerospace, and Aeros Aviation, breached the TTLA.

Insofar as Haler argues the damages portion of jury question 7 "makes it impossible to determine if the dollar figure supplied is attributable to Appellant or any of the other parties in this case," we disagree. Jury question 19 asked the jury to determine which percentage of the damage that each party caused. The jury determined that McKinney Aerospace and Aeros Aviation each bore zero percent liability, Eros bore 51 percent liability, and Haler bore 49 percent liability. By reading the jury's verdict in its entirety, the trial court could determine which percentage of the TTLA damages were attributable to Haler.

We overrule Haler's ninth issue.

## C. Comparative liability

In his thirteenth issue, Haler argues the trial court should not have entered judgment against him for the full amount of the damages because the jury attributed only 49 percent of the

liability to him and 51 percent of the liability to Andrew Eros. Haler did not raise this complaint at the trial court and did not preserve it for appellate review. *See* TEX. R. APP. P. 33.1(a).

### D. Attorney's Fees

In his eleventh issue, Haler argues the evidence was insufficient to support the jury's award of attorney's fees because Boyington did not segregate its attorney's fees related to its claims for which fees are recoverable from fees related to its claims for which fees are not recoverable.[1] We agree.

A party seeking to recover attorney's fees has the burden to show that the fees were reasonable and necessary, which, among other things, requires the party to show the fees were incurred on a claim that allows recovery of such fees. *See Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 10-11 (Tex. 1991). Where, as here, a party seeks attorney's fees in a case where some claims permit the recovery of fees and others do not, the party must segregate and exclude the fees for services related to the claims for which fees are not recoverable unless the discrete legal services advanced both the recoverable claim and the unrecoverable claim. *See Tony Gullo Motors I, L.P. v. Chapa,* 212 S.W.3d 299, 313-14 (Tex. 2006). When a party does not segregate attorney's fees between recoverable and unrecoverable claims in the court below and we determine segregation is required, the fee award must be reversed and the case must be remanded to the trial court to determine which fees are recoverable. *See id.* at 314 (unsegregated attorney's fees for entire case are some evidence of what segregated amount should be); *A.G. Edwards Sons, Inc. v. Beyer*, 235 S.W.3d 704, 710 (Tex. 2007) (same).

Although some of Boyington's claims permit the recovery of attorney's fees while others do not, Boyington did not segregate fees for the services related to the claims for which fees

---

[1] Haler also argues that although Boyington sought to recover fees for work performed by two attorneys and a legal assistant, Boyington did not provide sufficient evidence to support recovery of fees incurred for one of the lawyers and the legal assistant. Because we conclude Boyington did not segregate its fees, we do not consider this argument. *See* TEX. R. APP. P. 47.1.

were recoverable from the services related to the claims for which fees were not recoverable. Kevin Good, Boyington's attorney who testified about fees, testified the "final total of the legal fees and expenses that were billed to the client for this case," meaning the Haler case, was $98,167.58 plus additional fees and costs for trial preparation, which he estimated to be another $15,000. Neither Good's testimony nor the legal bills admitted as an exhibit segregated the fees. Because segregation was required, but was not done, we reverse the fee award and remand to the trial court to determine which fees are recoverable. We sustain Haler's eleventh issue to this extent. We do not consider whether Boyington's evidence of attorney's fees was sufficient in any other respect.

## CONCLUSION

Our resolution of Haler's fifth, ninth, eleventh, and thirteenth issues obviates the need to consider Haler's remaining issues, which if determined in Haler's favor would entitle him to no additional relief. *See* TEX. R. APP. P. 47.1.

We reverse the judgment in part and remand to the trial court for the limited purpose of determining the amount of recoverable attorney's fees.

In all other respects, we affirm the trial court's judgment.


120207F.P05


/Jim Moseley/
_____
JIM MOSELEY
JUSTICE



## Court of Appeals
## Fifth District of Texas at Dallas

# JUDGMENT

RANDALL LEE HALER, Appellant

No. 05-12-00207-CV      V.

BOYINGTON CAPITAL GROUP, INC., Appellee

On Appeal from the 429th Judicial District Court, Collin County, Texas
Trial Court Cause No. 429-02144-06.
Opinion delivered by Justice Moseley. Justices Bridges and Lang-Miers participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED** in part and **REVERSED** in part. We **REVERSE** that portion of the trial court's judgment awarding attorney's fees to appellee Boyington Capital Group, Inc. We **REMAND** this cause to the trial court to determine an award of reasonable attorney's fees incurred by appellee. In all other respects, the trial court's judgment is **AFFIRMED**.

It is **ORDERED** that each party bear its own costs of this appeal.


Judgment entered this 15th day of August, 2013.


                                     /Jim Moseley/
                                     JIM MOSELEY
                                     JUSTICE