

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-17-00062-CV

LLOYD WALTERSCHEID &amp;
WALTERSCHEID FARMS, LLC

APPELLANTS

V.

DANNY WALTERSCHEID

APPELLEE

----------

## FROM THE 235TH DISTRICT COURT OF COOKE COUNTY
## TRIAL COURT NO. CV15-00678

----------

## OPINION

----------

Appellants raise seven issues following a bench trial that resulted in a take-nothing judgment on their claims of breach of contract, fraud, and civil theft. We affirm.

## BACKGROUND

**I.      Factual and Procedural Background**

At the end of 2014, Appellant Lloyd Walterscheid (Lloyd) acquired a ranch in Muenster, Texas, that included approximately 120 head of cattle.  Lloyd owns and operates the ranch through Appellant Walterscheid Farms, LLC.  Appellee Danny Walterscheid (Danny) is the manager of the Kountry Korner convenience store, which is also located in Muenster, Texas.[1]  Danny's convenience store has a table where a group of local farmers and ranchers regularly meet to discuss and conduct business.

After Lloyd purchased the ranch, Danny contacted him to see if he wanted to sell some of his 120 cattle at the Red River Livestock Auction.[2]  Lloyd agreed, and the sale went well, which prompted Lloyd to purchase a share in the Red River Livestock Auction.  Thus, Lloyd and Danny engaged in two seemingly successful cattle-related transactions.  Lloyd does not dispute the success of these transactions.

However, things fell apart in 2015 when Lloyd and Danny became involved in a series of seven cattle purchases as part of a broader cattle investment

---

[1]Although Lloyd and Danny share a unique last name and hometown, to their knowledge they are not related by blood, but Lloyd said it is possible they are distant kin.

[2]The Red River Livestock Auction is located in Oklahoma and is the assumed name of LI Group, Inc., an entity formed and owned by Danny and several cattle ranchers in the Muenster area.

arrangement (Cattle Investment), which also involved Clint Sicking.  Sicking, who is also from Muenster, has been in the cattle business his entire life.  Having done business with Sicking before and considering him to be "very knowledgeable" about cattle, Danny suggested to Lloyd that they "invest[] in some cattle" with Sicking.  Lloyd agreed and the results were disastrous for him: In less than two months, Lloyd had paid out approximately $1 million but ended up with almost nothing to show for it—no profit, almost nothing left of his investment money,[3] and "[t]he cattle were gone."  Lloyd later found out that in 2013, prior to participating in the Cattle Investment, Sicking had signed a Consent Decision in an action brought against him by the Deputy Administrator of the Grain Inspection, Packers and Stockyards Administration (GIPS), which is an agency of the United States Department of Agriculture.  The Consent Decision, inter alia, required that Sicking cease and desist "[i]ssuing checks in purported payment of livestock purchases without having and maintaining sufficient funds on deposit[;]" "[f]ailing to pay, when due, the full purchase price of livestock[;]" and "[f]ailing to pay the full purchase price for livestock purchases."  Sicking was also assessed a $65,000 civil penalty.[4]

As a result of the failure of the Cattle Investment, Appellants filed suit against Danny (as well as LI Group, Inc. d/b/a Red River Livestock Auction and Clint Sicking) in the 235th District Court of Cooke County, Texas.  Danny and LI

[3]Lloyd testified that he did receive a little more than $55,000 back.

[4]At the time of trial, Sicking was still under investigation by the GIPS.

3

Group, Inc. brought a cross-claim against Sicking. Eventually, the trial court rendered interlocutory agreed judgments against Sicking in favor of Lloyd in the amount of $1.3 million, in favor of Danny in the amount of $256,558.95, and in favor of LI Group, Inc. in the amount of $828,289.15.[5]

At trial the only claims remaining were Appellants' claims against Danny.[6] Appellants contended that Danny had (1) breached an oral contract by failing to properly oversee Lloyd's monetary investment in the Cattle Investment and Sicking's role in caring for the cattle, by failing to return the funds Lloyd paid Danny for Sicking to purchase the cattle, and by failing to distribute profits to Lloyd; (2) committed fraud by suggesting that Lloyd invest with Sicking when Danny allegedly knew but failed to disclose that Sicking had signed the Consent Decree; and (3) committed civil theft by misappropriating Appellants' property.

## II. Trial Proceedings

On December 9, 2016, the parties appeared for a one-day bench trial. Lloyd, Danny, and Sicking all provided live testimony, and the trial court admitted 40 exhibits into evidence.

### A. Lloyd's Trial Testimony

Lloyd testified that after he purchased Walterscheid Farms, Danny contacted him to see if he wanted to sell his cattle at the Red River Livestock

---

[5]The interlocutory agreed judgments were incorporated into the final judgment.

[6]Appellants nonsuited their claims against LI Group, Inc. prior to trial.

4

Auction. Lloyd averred that Danny represented that he would pick up Lloyd's cattle and haul them to auction. Lloyd agreed, the cattle were sold, and Lloyd was paid. Lloyd testified that following the sale, Danny approached him to see if Lloyd wanted to purchase shares in the Red River Livestock Auction. Lloyd said it looked like a good deal, so he invested $159,000 on or about January 29, 2015, and became a shareholder in the Red River Livestock Auction.

After Lloyd's investment in the Red River Livestock Auction, Danny approached him again, this time to see if he would be "interested in investing in some cattle" with Sicking. Lloyd claimed that other than purchasing Walterscheid Farms, he had no experience investing in cattle. But Danny told Lloyd that Sicking had "some connections," was "very knowledgeable," and was someone with whom Danny had done business "for many years."

Lloyd stated that he had no knowledge of or involvement with Sicking prior to Danny's suggestion that he invest with Danny and Sicking:

> Q.  Now, when Mr. Walterscheid – when Danny Walterscheid came to you, after you bought the interest in the livestock auction and talked to you about this cattle investment, did you know Clint Sicking?
>
> A.  No, I did not.
>
> Q.  Never met him before?
>
> A.  No.

Lloyd also stated that Danny did not notify him of the Consent Decree or any problems related to Sicking.[7]

Lloyd explained his understanding of his role in this Cattle Investment as follows:

> Q. How was the deal going to work? Who was going to put up the money to buy the cattle?
>
> A. I was going to put up the money to buy the cattle.
>
> Q. That was your part of the deal?
>
> A. Yeah.
>
> . . . .
>
> Q. And when the cattle were sold, were you going to get your money back that you put up?
>
> A. Yes. I was told I'd make 15 to 20 percent on my money.
>
> . . . .
>
> Q. And then, would Mr. Sicking get reimbursed for the cost he had incurred in –
>
> A. Yes.
>
> Q. – keeping the cattle?
>
> A. Yes.
>
> Q. Were you going to get some interest on your money?
>
> A. Yes.
>
> Q. And then what was going to happen to the profit, the remaining money?

[7]Danny would testify that at the time of the Cattle Investment, none of his own deals with Sicking had "gone bad yet."

6

A. Then that would be divided up.

Q. Okay. And how was it going to be divided up?

A. Well, I think we were all going to get a third of the profits.

Lloyd explained that Sicking's role in the Cattle Investment would be to take care of the cattle:

Q. [W]ho would take care of the cattle after they were purchased?

A. Clint [Sicking] would take care of the cattle.

. . . .

Q. And then what was going to happen? Who was going to pay to keep the cattle and feed the cattle?

A. Clint [Sicking] was going to keep the cattle and care for them.

. . . .

Q. And Clint Sicking was going to manage, pasture, feed, take care of the cattle; is that correct?

A. Yes, to my knowledge.

Lloyd then clarified that Danny's role in the Cattle Investment was to maintain a spreadsheet of the cattle purchased—not to transport or move the cattle:

Q. According to the deal, they were supposed to be pastured, managed, fed and kept by Clint Sicking, correct?

A. Yes.

Q. Danny didn't have any involvement in the deal after the cattle were purchased, correct?

7

A. I'm not sure.

Q. But the agreement he was – Danny wasn't – Danny never transported cattle, moved cattle, correct?

A. Not to my knowledge.

Q. Now did Danny Walterscheid tell you whether he was going to make any money off of this arrangement that he was suggesting you invest in?

A. Yes. He was going to make a small percentage off of putting everything together and keeping track of everything.

Q. And when you said he was going to keep track of everything, what did Mr. Walterscheid tell you he was going to do?

A. He had a spreadsheet on his computer where he kept track of how many cattle were purchased and the price paid and how much per head or the cost per head.

On cross-examination, Lloyd confirmed that not only was Danny in charge of keeping records, but that Danny had, in fact, kept and provided the records:

Q. Right. [Danny] kept the – kept the books.

A. Yeah.

Q. As a matter of fact, that's how you even knew how many head of cattle – when all this went bad, that's how you knew how many head of cattle you should have had, correct?

A. Yeah.

Q. And has Danny been cooperative with you in getting you those records?

A. Yes.[8]

---

[8]Lloyd did, however, testify elsewhere that Danny never presented him with a breakdown of the cattle purchases.

On March 9, 2015, Lloyd wrote Danny a check for $139,090 for "41 bred heifers and 63 heifers," and Danny wrote Lloyd a receipt. Additional transactions occurred between Lloyd and Danny as follows:

- On March 17, 2015, Lloyd wrote Danny a check for $100,000;

- On March 23, 2015, Lloyd wrote Danny a check for $135,568.96;

- On April 1, 2015, Lloyd wrote Danny a check for $78,450, of which $22,740 was used to purchase 12 bred heifers and the remaining $55,710 was returned to Lloyd;

- On April 6, 2015, Lloyd wrote Danny a check for $140,234.71 for 117 head of calves;

- On April 14, 2015, Lloyd wrote Danny a check for $111,875.00 for 98 calves; and

- On April 28, 2015, Lloyd wrote Danny a check for $168,295.00 for 97 cows and 8 heifers.

Lloyd testified that the total amount he paid Danny in less than two months was more than $873,000.

Beginning in May 2015, Lloyd began writing checks directly to Sicking. On May 14, 2015, Lloyd wrote Sicking a check for $155,800.89 for 143 head, and on June 30, 2015, Lloyd wrote Sicking a check for $187,220. Shortly thereafter, a check for $385,121.20 from Sicking's company to Lloyd was denied for insufficient funds.

Lloyd attempted to distinguish the first two transactions in the Cattle Investment from the last five transactions; namely, that the first two transactions were to be for "market" or "market support" cattle—i.e., cattle that Lloyd would

9

purchase, Clint would care for on a short-term basis, and that would then be promptly sold through Red River Livestock Auction for sale[9]—and the next five transactions which, according to Lloyd were for "wheat" cattle—i.e., cattle that Lloyd would purchase and Clint would care for on a longer-term basis before they were sold, although not necessarily through the Red River Livestock Auction and not at any specified date.

Lloyd was also asked about whether Danny told him when he was supposed to be repaid the money he invested:

Q. Now, did Mr. Danny Walterscheid give you any kind of idea of how long it would take for these investments to, in effect, roll over and for you to get your money?

A. Well, the bred heifers, as soon as they'd calve, they were going to sell them as pairs. And the other heifers, they were going to feed them out until they got, you know, 900 pounds or whatever and then sell them.

Q. Did he give you an idea [of] how long that was going to take?

A. Yeah, it was about three or four months for the calves.

But during cross-examination, Lloyd was also asked about the terms of the Cattle Investment and he acknowledged that there was no guarantee of a return on his investment:

---

[9]Lloyd testified that after the market supply cattle were sold, he would receive 15%–20% on his investment, Sicking would be reimbursed for his costs, and the remaining profits would be divided evenly among Lloyd, Danny, and Sicking. Although Danny acknowledged that he, Lloyd, and Sicking agreed regarding the profit distribution for the market supply cattle, he asserted that they had never agreed if and when Lloyd would be reimbursed for his initial investment.

Q. There was no guarantee[] of a return on investment, because you don't know what the market price for the cattle –

A. Well, most of these calves that they put on wheat field, they've got contracts on them, so you knew what the sale price was going to be when you bought them.

Q. Well, my question is: There was no way to guarantee that return. The return is going to fluctuate, correct?

A. Well, I guess. But, you know, they had these contracts on these calves, so you knew what they were going to sell for.

Indeed, when pressed on the specific terms of the alleged oral contract, including ownership of the cattle and profit distribution, Lloyd equivocated:

Q. After those first two [market cattle] transactions, all the other [wheat cattle] deals, the profits were going to be -- those deals were between you and Clint [Sicking], is what I'm getting at. Danny wasn't going to receive any profits from any of the other deals?

A. *I don't recall*. *I assumed* he was making profits on all the deals that he was doing.

[Emphasis added.]

. . . .

Q. Okay. And all the wheat cattle were to be your cattle, belonging to you, correct?

A. *I guess so*, I paid for them. *I guess* they would belong to me.

Q. Right. My question is: Danny didn't have any ownership interest or a profit interest in those wheat cattle, correct?

A. *I'm not sure* about that. *I assumed* he did since he was putting these deals together.

Q. But he didn't tell you or there wasn't any agreement that he was to get a profit out of those cattle, correct?

A. *I don't remember* him telling me that.

11

[Emphasis added.]

. . . .

    Q.     Okay. And when those cows sold, the wheat cattle sold, how was that supposed to be handled as far as the profits, if any?

    A.     *I assumed it was* – everything was done the same way.

[Emphasis added.]

Even on direct examination, Lloyd could not unequivocally state the division of the profits:

    Q.     And then what was going to happen to the profit, the remaining money?

    A.     Then that would be divided up.

    Q.     Okay. And how was it going to be divided up?

    A.     Well, *I think we were all going to get a third* of the profits.

[Emphasis added.]

Finally, Lloyd conceded that he was unaware of any wrongdoing by Danny with regard to the missing cattle:

    Q.     Well, let me ask you this: Do you truly think that Danny Walterscheid or LI Group had anything to do with the cattle going missing?

    A.     I'm not sure.

**B.   Sicking's Video Deposition**

Next, Lloyd presented a portion of Sicking's video deposition to the trial court. However, Sicking asserted his Fifth Amendment right against self-incrimination and refused to answer any questions at the deposition. The trial

court stopped the video and simply admitted the entire deposition transcript into evidence.

## C. Danny's Trial Testimony

Lloyd's next witness was Danny. Danny testified that as soon as Sicking's $385,121.20 check to Lloyd was rejected for insufficient funds, Danny began questioning his own cattle investments with Sicking. Danny acknowledged that "[i]n retrospect" Sicking had already "cheated" him before Danny suggested the Cattle Investment to Lloyd; but hindsight notwithstanding, Danny testified that at the time he first met Lloyd, Sicking did not owe him any money, and Danny did not have any "doubts" about Sicking or know about his trouble with the GIPS and the Consent Decision.[10] Danny testified that for the first two "market support" cattle transactions, the three agreed to buy a combination of bred heifers and heifers, have Sicking feed and condition them for two weeks, and then sell them two weeks later and split the profits three ways.

Danny said the plan was to use money Lloyd put up to continue buying cattle, which would then be sold. Danny also explained that he and Lloyd never discussed when Lloyd would get his money back because the understanding was that they were simply going to "roll" the funds into more cattle purchases:

Q. When was [Lloyd] supposed to get his money back?

A. Never was discussed.

---

[10]Danny later testified that he was aware of the Consent Decision in March of 2015.

13

Q.    And he never got his money back?

A.    No, sir.

THE COURT:    I'm sorry, you said it was never discussed that when he'd get his money back?

THE WITNESS:    Correct. We continued – we just figured we'd continue rolling it, I guess is what that would be like.

Later, the trial court asked Danny about what happened to the money that Lloyd had given him, and Danny testified that all the funds were forwarded to Sicking:

THE COURT:    Can I ask you – let me ask you. Mr. Walterscheid, all of the money that Lloyd Walterscheid gave you, did you forward all the money to Mr. Sicking?

THE WITNESS:    Yes.

THE COURT:    You didn't keep any of it?

THE WITNESS:    I did not keep any of it, other than the market support. The 50,000 he was asking me about these checks, these for 23,000 or 23,000 for cows, that was for the next support.

THE COURT:    Other than the first two deals?

THE WITNESS:    Yes.

**D.    Sicking's Trial Testimony**

After Lloyd concluded his case-in-chief, Danny called Sicking as his only witness. Sicking's testimony regarding his background with Lloyd contradicted Lloyd's testimony that he had never met Sicking or knew Sicking prior to the 2015 Cattle Investment:

14

Q.   And do you know Lloyd Walterscheid?

A.   Yes, sir.

Q.   How do you know Lloyd Walterscheid?

A.   He's contacted me several times to go out there and get his calves from his ranch that him and his brother own at Marysville, and I hauled them to the sale barn for him.

Q.   When was that?

A.   Anywhere from – roughly, I don't know, the Muenster Livestock closed in 2010.  I know I hauled some there for him.  And then after that, I hauled some to Gainesville for him so I'd say anywhere from 2008 to 2012, '13.  And then he contacted me the first – early 2015 to [haul] 40-something pair from Northern Oklahoma to his place in Nocona.

Q.   Okay.  Wait a minute.  So you say that you – Lloyd spoke with you – y'all knew each other back in 2010?

A.   I've never – yeah, it's just over the phone; phone call:  Come get my cattle, I have such and such head out here, I need you to take them to the sale barn.  I'd go out there and get them.

. . . .

Q.   And I believe Mr. Walterscheid, Lloyd Walterscheid testified he didn't know you and hasn't had any business dealings with you.  Did you hear that testimony?

A.   Yes, sir.

Q.   So you're telling us that's not accurate?

A.   Yes, sir.

Sicking also testified that the exact amount of money that Lloyd paid

Danny would always go to him and that he used all the money to purchase cattle:

Q.   Okay.  And did you always get a check from Danny in the exact amount that you quoted on your sheet that you needed for the cattle?

15

A.   Yes, sir.

Q.   And did you generally have a number of head of cattle in each transaction?

A.   Yes, sir.

Q.   And from the moneys that Danny Walterscheid passed on to you, did you buy – actually buy and purchase those cattle?

A.   Yes sir. . . .

Sicking's testimony also confirmed that Danny had nothing to do with transporting the cattle or with the actual grazing and care of the cattle:

Q.   Did Danny have anything to do with transporting the cattle?

A.   No, sir.

Q.   And you were the one going to take care of pasturing them, feeding them, pulling calves, whatever you needed to do, correct?

A.   Yes.

Q.   At any time after the cattle were acquired and pastured, did Danny have any control or possession over those cattle?

A.   No.

Q.   Did Danny Walterscheid have any role in or control over your cattle operations?

A.   No.

. . . .

Q.   Were any of these cattle that you acquired, other than the 66 heifers, put on Danny's property?

A.   No.

16

## E. Closing Argument

During closing argument, Appellants' counsel argued that Appellants established the following oral contract existed:

[APPELLANTS' COUNSEL]: . . . the contract would be that my client would put up the money to acquire the cattle, number one.

Number two, the cattle would be fattened and fed at some location by Mr. Sicking. The cattle would be sold. And upon sale, my client would get his money back. And then the profit -- and then Mr. Sicking would get his cost of keeping the cattle, and the remaining profits would be divided as testified to.

The trial court pointedly asked Appellants' counsel what evidence presented at trial established the existence of such a contract:

THE COURT: And what do you think establishes that they had that contract, that agreement?

[APPELLANTS' COUNSEL]: The testimony of both Mr. Lloyd Walterscheid and the testimony of Mr. Danny Walterscheid. I think it's conceded.

THE COURT: I'm going to disagree that Mr. Walterscheid conceded that.

## F. Final Judgment and Findings of Fact and Conclusions of Law

The judge ruled from the bench in favor of Danny as to all of Appellants' claims and their request for attorney's fees. On December 20, 2016, the trial court rendered a final judgment providing that Appellants take nothing on their claims against Danny.

Appellants timely filed a request for findings of fact and conclusions of law, a notice of past-due findings of fact and conclusions of law, and a motion for new

17

trial. On January 31, 2017, the trial court entered the following relevant findings of fact and conclusions of law:

### FINDINGS OF FACT

. . . .

**6.** Lloyd Walterscheid and Danny Walterscheid are both shareholders of the LI Group, Inc. which operates a livestock sale barn.

**7.** Lloyd Walterscheid both individually and doing business as Walterscheid Farms, LLC buys and sells cattle.

**8.** Danny Walterscheid individually buys and sells cattle.

**9.** In 2015 Danny Walterscheid on multiple occasions made Lloyd Walterscheid aware of opportunities to purchase cattle through Clint Sicking.

**10.** Lloyd Walterscheid individually and doing business as Walterscheid Farms, LLC purchased cattle through Clint Sicking in a series of transactions in 2015 that are the basis of Plaintiffs' suit.

**11.** With the exception of the last two cattle transactions Plaintiffs gave checks payable to Danny Walterscheid . . . . Danny Walterscheid deposited those checks into his account and within a day on each transaction wrote checks payable to Clint Sicking for the same amount he had received from Plaintiffs. In the last two cattle transactions Plaintiffs gave checks directly to Clint Sicking.

**12.** Plaintiff Lloyd Walterscheid saw at least some of the cattle that Plaintiffs purchased through Clint Sicking[;] however[,] Plaintiffs never went and counted the cattle to confirm the quantity.

**13.** There were no written contracts between the parties.

18

## *CONCLUSIONS OF LAW*

. . . .

**4.** The bench trial began and ended on December 9, 2016. The Court issued a bench ruling that the evidence was insufficient to support . . . findings for Plaintiffs and found as follows for plaintiffs' cause of actions:

    a.    Breach of contract – Finding for Defendant Danny Walterscheid

    b.    Civil Theft Claim – Finding for Defendant Danny Walterscheid

    c.    Fraud Claim – Finding for Defendant Danny Walterscheid

. . . .

The evidence was legally and factually insufficient to support that there was [1] a valid and enforceable contract between Plaintiffs and Danny Walterscheid [2] that was breached by Danny Walterscheid.

. . . .

On February 16, 2017, the trial court denied Appellants' motion for new trial. Appellants timely perfected this appeal.

## ISSUES PRESENTED

In their first, second, and third issues, Appellants contend that the trial court erred in finding there is legally and factually insufficient evidence to demonstrate the existence of a valid, oral contract between Lloyd and Danny; in finding there is factually and legally insufficient evidence to support that Danny breached the contract they claim existed; and generally that there is legally and factually insufficient evidence to support their breach of contract claim.

19

In issues four, five, and six, Appellants contend that the trial court erred by finding that there was legally and factually insufficient evidence to support their claims of common-law fraud and fraud by nondisclosure. Appellants argue that Danny made misrepresentations concerning "the payments that would be made to Appellants, including repayment of the entire amounts funded for each cattle acquisition and the 1/3 net profits interest, all of which Appellants were to receive but never did." Appellants also argue that the evidence supported that Danny knew about Sicking's Consent Decree but failed to disclose its existence to Lloyd in spite of having a duty to disclose.

In their seventh issue, Appellants argue that the evidence at trial established their claim against Danny for civil theft under the Texas Theft Liability Act (TTLA).

**STANDARD OF REVIEW**

In an appeal from a bench trial, the trial court's findings of fact have the same force and effect as jury findings. *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991). We review a trial court's findings of fact under the same legal and factual sufficiency of the evidence standards that we use when we determine whether sufficient evidence exists to support an answer to a jury question. *Kennon v. McGraw*, 281 S.W.3d 648, 650 (Tex. App.—Eastland 2009, no pet.).[11]

_____

[11]When, as in this case, a reporter's record is part of the appellate record, the appellant may challenge the legal and factual sufficiency of implied findings

20

When a party attacks the legal sufficiency of an adverse finding on an issue on which it has the burden of proof, it must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue. *Dow Chemical Company v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001); *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex. 1989). The appellate court first examines the record for evidence that supports the finding, while ignoring all evidence to the contrary unless a reasonable factfinder could not. *Dow Chemical*, 46 S.W.3d at 241; *City of Keller v. Wilson*, 168 S.W.3d 802, 821–22 (Tex. 2005). If there is no evidence to support the finding, the reviewing court will then examine the entire record to determine if the contrary proposition is established as a matter of law. *Dow Chemical*, 46 S.W.3d at 241.

In a factual sufficiency review of an issue on which the appellant had the burden of proof, we consider all the evidence and will uphold the trial court's finding unless the credible evidence is too weak to support it or the finding is so against the great weight and preponderance of the credible evidence contrary to

_____

the same as jury findings or a trial court's findings of fact. *Roberson v. Robinson*, 768 S.W.2d 280, 281 (Tex. 1989). When the trial court's findings of fact address a ground of recovery, we may infer an omitted element because the judgment is presumed valid. *See* Tex. R. Civ. P. 299; *Hailey v. Hailey*, 176 S.W.3d 374, 383–84 (Tex. App.—Houston [1st Dist.] 2004, no pet.). An omitted finding will be deemed to support the judgment if evidence exists to support the finding. *See* Tex. R. Civ. P. 299; *Lindner v. Hill*, 691 S.W.2d 590, 592 (Tex. 1985). In reviewing the record to determine whether any evidence supports an implied finding, we consider evidence in the light most favorable to the trial court's finding and indulge every reasonable inference that would support it. *See Jamshed v. McLane Exp. Inc.*, 449 S.W.3d 871, 876 (Tex. App.—El Paso 2014, no pet.).

21

the finding. *Serv. Corp. Int'l v. Aragon*, 268 S.W.3d 112, 118 (Tex. App.—Eastland 2008, pet. denied); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965).

We review a trial court's conclusions of law de novo as a question of law. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002); *A & W Indus., Inc. v. Day*, 977 S.W.2d 738, 741 (Tex. App.—Fort Worth 1998, no pet.). We independently evaluate conclusions of law to determine whether the trial court correctly drew the legal conclusions from the facts. *Walker v. Anderson*, 232 S.W.3d 899, 908 (Tex. App.—Dallas 2007, no pet.). We will uphold the trial court's conclusions of law if any legal theory supported by the evidence can sustain the judgment. *OAIC Commercial Assets, L.L.C. v. Stonegate Vill., L.P.*, 234 S.W.3d 726, 736 (Tex. App.—Dallas 2007, pet. denied). We will reverse the judgment of the trial court only if the conclusions are erroneous as a matter of law. *Id.*

## DISCUSSION

### I. Appellants' Breach of Contract Claim

The first issue we address is whether there is sufficient evidence to support the existence of a legally enforceable oral contract.

#### A. Elements of an Oral Contract

To prevail on a breach of contract claim, the plaintiff must establish: (1) a valid contract with the defendant; (2) the plaintiff performed or tendered performance; (3) the defendant breached the contract; and (4) the plaintiff suffered damages as a result of the breach. *Critchfield v. Smith*, 151 S.W.3d

22

225, 233 (Tex. App.—Tyler 2004, pet. denied); *Runge v. Raytheon E–Sys., Inc.*, 57 S.W.3d 562, 565 (Tex. App.—Waco 2001, no pet.).

The requirements of written and oral contracts are the same and must be present for a contract to be binding. *Critchfield*, 151 S.W.3d at 233. In order to have a valid and binding contract, there must be: (1) an offer; (2) acceptance in strict compliance with the terms of the offer; (3) a meeting of the minds; (4) each party's consent to the terms; and (5) execution and delivery of the contract with the intent that it be mutual and binding. *Hubbard v. Shankle*, 138 S.W.3d 474, 481 (Tex. App.—Fort Worth 2004, pet. denied); *Labor Ready Cent. L.P. v. Gonzalez*, 64 S.W.3d 519, 522 (Tex. App.—Corpus Christi 2001, no pet.). To be legally binding, a contract must be sufficiently definite in its terms so that a court can understand what the promisor undertook. *T.O. Stanley Boot Co., Inc. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992). "The material terms of the contract must be agreed upon before a court can enforce the contract." *Id.* Thus, where an essential term is open for future negotiation, there is no binding contract. *Beal Bank, S.S.B. v. Schleider*, 124 S.W.3d 640, 653 (Tex. App.—Houston [14th Dist.] 2003, pet. denied); *Gerdes v. Mustang Expl. Co.*, 666 S.W.2d 640, 644 (Tex. App.—Corpus Christi 1984, no writ).

In determining the existence of an oral contract, the court looks to the communications between the parties and to the acts and circumstances surrounding those communications. *Prime Prods., Inc. v. S.S.I. Plastics, Inc.*, 97 S.W.3d 631, 636 (Tex. App.—Houston [1st Dist.] 2002, pet. denied) (citing

23

*Copeland v. Alsobrook*, 3 S.W.3d 598, 605 (Tex. App.—San Antonio 1999, pet. denied)). The terms must be expressed with sufficient certainty so that there will be no doubt as to what the parties intended. *Copeland*, 3 S.W.3d at 605. "It is well established that the terms of an oral contract must be clear, certain, and definite." *Gannon v. Baker*, 830 S.W.2d 706, 709 (Tex. App.—Houston [1st Dist.] 1992, writ denied). Thus, if an alleged oral agreement is so indefinite that it is impossible for a court to fix the legal obligations and liabilities of the parties, it cannot constitute an enforceable contract. *Id.*; *accord Osa v. Neill Invs., LLC.*, No. 02-17-00181-CV, 2018 WL 1755224, at * 4 (Tex. App.—Fort Worth Apr. 12, 2018, no pet.) (mem. op.). A lack of definiteness precluding the existence of an enforceable contract can concern the time of performance, the price to be paid, the work to be done, the service to be rendered, or the property to be transferred. *Gannon*, 830 S.W.2d at 709*; see also Ludlow v. DeBerry*, 959 S.W.2d 265, 272 (Tex. App.—Houston [14th Dist.] 1997, no pet.) (stating for an agreement to be enforceable, there must be a meeting of the minds with respect to the agreement's subject matter and essential terms).

### B.    Scope of Agreement Between Lloyd and Danny

We agree with Appellants that the record supports that Danny agreed as part of the Cattle Investment to take money from Lloyd and deliver the money to Sicking for Sicking to then purchase and manage cattle for Lloyd. It is also apparent from the record that Danny agreed to maintain records of the Cattle Investment on a spreadsheet on his computer. And the record demonstrates that

24

Danny acted in accordance with this oral agreement because he, in fact, agreed that he took money from Lloyd, delivered the money to Sicking for the purchase of cattle, and maintained records of the transactions.

The record also demonstrates, however, that there was no definite agreement for Danny to provide any **oversight** of Sicking and of the day-to-day care of the cattle. There was no testimony or other evidence to support that the actions of the parties demonstrated that Danny and Lloyd agreed that Danny would oversee Sicking and the care of the cattle. Instead, the relevant testimony supported that Danny had no role in overseeing Sicking or the cattle. Therefore, we hold that based on our review of the record, deferring as we must to the factfinder on issues of witness credibility and resolution of conflicting evidence, some evidence supports the trial court's implied finding that Danny did not agree to oversee Sicking and the cattle as part of the Cattle Investment. *See Wiley v. Bertelsen*, 770 S.W.2d 878, 883 (Tex. App.—Texarkana 1989, no writ) (holding no oral contract between ranch managers and ranch owners because "[t]he terms of the offer and acceptance as set forth . . . are equivocal and lack the required specificity to be an enforceable contract").

The evidence in the record is also sufficient to support that the implied finding that there was no definite agreement between Danny and Lloyd that guaranteed Lloyd would be repaid on his investment, that provided a time when Lloyd would be repaid on his investment, or that set forth how to divide any profits in the Cattle Investment. Lloyd testified, "I don't remember exactly how

25

the profits were going to be split, but – but Danny was going to get a percentage of it . . . ." Danny testified that he and Lloyd never agreed that Lloyd would be repaid for his investment. Based on our consideration of the evidence, deferring to the factfinder on issues of witness credibility and the resolution of conflicting evidence, we hold that some evidence supports the trial court's implied finding that there was no valid oral contract between Lloyd and Danny because there was no definite agreement regarding the material terms of if and when Lloyd would be repaid on his investment and how the profits were to be divided. *See T.O. Stanley Boot Co.*, 847 S.W.2d at 221–22 (holding alleged loan contract failed for indefinite repayment terms and that courts are not free to simply supply such missing material terms); *Wiley*, 770 S.W.2d at 883 (holding no oral contract between ranch manager and ranch owners when parties did not specify a percentage amount of how proceeds would be divided).[12]

---

[12]Appellants' contention that the alleged oral contract involving Danny's purported oversight of Sicking and the cattle represents a continuing contract is also misplaced. In support of their contention, Appellants erroneously rely upon our decision in *Hubble v. Lone Star Contracting Corp.*, a case that concerned a construction contract. 883 S.W.2d 379, 381–82 (Tex. App.—Fort Worth 1994, writ denied). Here, we are not considering a construction contract, and Appellants provide no authority for the proposition that the law of continuing contracts is applicable to the instant alleged oral contract that is undisputedly not a construction contract. Indeed, Appellants' only case cited to address this contention in their reply brief was *Godde v. Wood*, a case involving debt alleged to be due under an "oral building contract." 509 S.W.2d 435, 437 (Tex. App.—Corpus Christi 1974, writ ref'd n.r.e.). As such, we find Appellants' argument and case law in support of their continuing contract argument inapposite.

Accordingly, we overrule Appellants' first and second issues. And, because we hold that there is no enforceable oral contract, we need not address Appellants' third issue regarding breach. *See* Tex. R. App. P. 47.1; *Advantage Physical Therapy, Inc. v. Cruse*, 165 S.W.3d 21, 26 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (declining to address appellant's "remaining issues concerning whether [appellee] breached the [alleged contract] or whether there is sufficient evidence to show a breach occurred" after appellate court held that the alleged contract was not enforceable).

## II. Appellants' Fraud Claim

In issues four, five, and six, Appellants argue that the trial court erred in finding that the evidence was legally and factually insufficient to support that Danny made a material false misrepresentation and that at the time the representation was made, he knew it was false. Appellants contend that the evidence adduced at trial was legally and factually sufficient to support that Danny knew but failed to disclose "the payments that would be made to Appellants, including repayment of the entire amounts funded for each cattle acquisition and the 1/3 net profits interest, all of which Appellants were to receive but never did," and that Danny knew about Sicking's Consent Decree but failed to disclose its existence to Lloyd in spite of having a duty to disclose.

### A. Elements of Fraud

For Appellants to prevail on a common-law fraud claim, they must have proved that (1) Danny made a material misrepresentation; (2) Danny knew the

representation was false or made the representation recklessly without any knowledge of its truth; (3) Danny made the representation with the intent that Appellants would act on that representation or intended to induce their reliance on the representation; and (4) Appellants suffered an injury by actively and justifiably relying on that representation. *Exxon Corp. v. Emerald Oil & Gas Co., L.C.*, 348 S.W.3d 194, 217 (Tex. 2011).

Fraud by nondisclosure is considered a subcategory of common-law fraud. *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 181 (Tex. 1997). To succeed on a claim for fraud by nondisclosure, Appellants must have established: (1) Danny failed to disclose facts to Appellants; (2) Danny had a duty to disclose those facts; (3) the facts were material; (4) Danny knew Appellants were ignorant of the facts and did not have an equal opportunity to discover the facts; (5) Danny was deliberately silent when he had a duty to speak; (6) by failing to disclose the facts, Danny intended to induce Appellants to take some action or refrain from acting; (7) Appellants relied on Danny's nondisclosure; and (8) Appellants were injured as a result of acting without that knowledge. *Blankinship v. Brown*, 399 S.W.3d 303, 308 (Tex. App.—Dallas 2013, pet. denied).

## B.    Record Supports Finding of No Common-Law Fraud

Lloyd's testimony regarding what Danny represented to him regarding how he would be repaid for the Cattle Investment and even who owned the cattle was, at best, equivocal:

Q.   And then what was going to happen to the profit, the remaining money?

A.   Then that would be divided up.

Q.   Okay.  And how was it going to be divided up?

A.   Well, *I think* we were all going to get a third of the profits.

[Emphasis added.]

. . . .

Q.   Okay.   And all the wheat cattle were to be your cattle, belonging to you, correct?

A.   *I guess so*, I paid for them.  *I guess* they would belong to me.

Q.   Right.   My question is:   Danny didn't have any ownership interest or a profit interest in those wheat cattle, correct?

A.   *I'm not sure* about that.   *I assumed* he did since he was putting these deals together.

Q.   But he didn't tell you or there wasn't any agreement that he was to get a profit out of those cattle, correct?

A.   *I don't remember* him telling me that.

[Emphasis added.]

. . . .

Q.   Okay.  And when those cows sold, the wheat cattle sold, how was that supposed to be handled as far as the profits, if any?

A.   *I assumed it was* – everything was done the same way.

[Emphasis added.]

For his part, Danny testified that there was *no discussion* regarding repayment because the investment would be "rolled" into the next investments

and that he never made any guarantees or promises to Lloyd that he would see a return on his investment.

Therefore, some evidence supports the trial court's implied finding that Danny did not make a material representation regarding repayment of Lloyd's investment and distribution of any profits, and the finding is not against the great weight and preponderance of the evidence. *See Guevara v. Lackner*, 447 S.W.3d 566, 575 (Tex. App.—Corpus Christi 2014, no pet.) (dismissing common-law fraud claim because no evidence supported that defendant made an affirmative, material misrepresentation).

## C.    Record Supports Finding of no Fraud by Nondisclosure

According to Lloyd, Danny made partial disclosures regarding Sicking and thereby created the duty to disclose Danny's prior bad deals with Sicking as well as the Consent Decision, which was allegedly known to Danny. We disagree.

Appellants do not direct us to any evidence in the record to show that *Danny* knew that Lloyd was ignorant of the Consent Decision. In fact, Danny testified that he did not know whether Lloyd had any knowledge of Sicking's past:

Q.    Now you understand, [Lloyd] didn't know Clint sic 'em – Sicking from sic 'em at that point, did he?

A.    I don't know.

Danny also testified that *he* was unaware that Sicking had signed the Consent Decision at the time of the Cattle Investment. Although, Danny did subsequently state that he had known about the Consent Decision at the time of

30

the Cattle Investment, we defer to the trier of fact as the sole judge of witness credibility to reasonably resolve such inconsistencies in testimony. *See Theobold v. Pate*, 542 S.W.2d 460, 466 (Tex. Civ. App.—Tyler 1976, writ dism'd w.o.j.) ("Where there is evidence of probative force to support the findings and judgment of the trial court such findings are controlling on the reviewing court and will not be disturbed even though the evidence is conflicting and the appellate court might have reached a different result. It is within the province of the trier of facts to determine the weight and credibility of each witnesses' testimony thereby resolving conflicts and inconsistencies between the testimony of all witnesses.") (internal citations omitted); *see also Treuil v. Treuil*, 311 S.W.3d 114, 125–26 (Tex. App.—Beaumont 2010, no pet.) (Gaultney, J., dissenting) ("As the fact-finder in this bench trial, the trial judge was responsible for assessing the credibility of the witnesses and for resolving conflicts in the evidence. *City of Keller*, 168 S.W.3d at 819–20. As an appellate court, we must presume that, in a case in which a fact-finder has conflicting evidence to resolve, the fact-finder resolved all conflicts in favor of the prevailing party. As a reviewing court, we are not free to resolve the conflicts in testimony differently from the fact-finder.").

Therefore, because evidence supports an implied finding that Danny did not know that Lloyd was ignorant of the Consent Decision, because a reasonable factfinder could resolve conflicting testimony in such a manner to impliedly find that Danny himself did not know of the Consent Decision, and because that evidence was not against the great weight and preponderance of the contrary

31

evidence, the trial court's finding that Lloyd take nothing on his fraud by nondisclosure claim is not factually or legally insufficient. *See Lake v. Cravens*, 488 S.W.3d 867, 893 (Tex. App.—Fort Worth 2016, no pet.) (no fraud by nondisclosure when no evidence defendant knew of plaintiff's lack of knowledge and was deliberately silent).

Because after reviewing the record and deferring to the trial court on issues of witness credibility and the resolution of conflicting evidence we conclude that there is some evidence to support the trial court's implied findings that Danny made neither a fraudulent representation nor committed common-law fraud and that such findings are not against the great weight and preponderance of the evidence, we overrule Appellants' fourth, fifth, and sixth issues.

## III.    Appellants' Civil Theft Claim

In their seventh issue, Appellants argue that the trial court erred in finding the evidence adduced at trial was factually and legally insufficient to support their claim against Danny for civil theft under the TTLA; namely, that Danny unlawfully and without authorization assumed and exercised dominion and control over Appellants' property, to the exclusion of or inconsistent with Appellants' rights.

### A.    The Elements of Civil Theft

Under the TTLA, a person who commits theft, which includes the unlawful appropriation of property under section 31.03 of the penal code, is liable for the damages resulting from the theft. Tex. Civ. Prac. & Rem. Code Ann. § 134.002 (West Supp. 2017), § 134.003 (West 2011). A theft occurs when

32

(1) property is (2) unlawfully appropriated (3) by someone (4) with intent to deprive the owner of that property. *See* Tex. Penal Code Ann. § 31.03(a) (West Supp. 2017); *Haler v. Boyington Capital Group, Inc.*, 411 S.W.3d 631, 635 (Tex. App.—Dallas 2013, pet. denied).

### B.    Evidence Supports Finding of No Civil Theft

The evidence presented to the trial court shows that Lloyd provided funds to Danny and authorized him to provide the funds to Sicking as part of the Cattle Investment. Thus, the evidence supports the implied finding that Lloyd effectively consented to the payments to Danny to be paid to Sicking. *See* Tex. Penal Code Ann. §§ 31.01(3) (defining "effective consent"), 31.03(b)(1) (providing a lack of owner's effective consent as a necessary element of theft) (West Supp. 2017). Because evidence supports that Lloyd consented to Danny providing the funds to Sicking (and that Danny actually provided Sicking with said funds), and because there was no evidence to the contrary, we hold that Appellants failed to establish the second element that Lloyd's funds were unlawfully appropriated. *See* Tex. Penal Code Ann. § 31.03; *Haler*, 411 S.W.3d at 635; *see also McPeters v. LexisNexis*, 910 F. Supp. 2d 981, 993 (S.D. Tex. Oct. 3, 2012) (mem. op.) (holding civil theft "claim fails because [plaintiff] knowingly consented" to pay amounts charged).

Appellants' civil theft claim also fails because, based on our review of the record, the evidence showed that Danny did not intend to deprive Appellants of their property at the time of the alleged taking. *See* Tex. Penal Code Ann.

§ 31.03(a); *McCullough v. Scarbrough, Medlin & Assocs., Inc.*, 435 S.W.3d 871, 906 (Tex. App.—Dallas 2014, pet. denied) ("The relevant 'intent to deprive' [under the TTLA] is the person's intent at the time of the taking."). Therefore, the trial court's implied finding that Danny did not intend to deprive Appellants of their property is supported by and is not against the great weight and preponderance of the evidence.

Accordingly, we overrule Appellants' seventh issue.

## CONCLUSION

Having held that the evidence supports the final judgment, we affirm the trial court's judgment.

/s/ Mark T. Pittman
MARK T. PITTMAN
JUSTICE

PANEL:  SUDDERTH, C.J.; GABRIEL and PITTMAN, JJ.

DELIVERED:  August 2, 2018

34