

# NUMBER 13-20-00285-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

BYRON WALKER,                                                                 Appellant,

v.

GLORIA WALKER A/K/A
MICKEY WALKER,                                                               Appellee.

## On appeal from the County Court at Law No. 1
## of Ellis County, Texas.

## MEMORANDUM OPINION

### Before Justices Longoria, Hinojosa, and Silva
### Memorandum Opinion by Justice Hinojosa

Appellant and cross-appellee Byron Walker appeals[1] a judgment following a jury

---

[1] This appeal was transferred to this Court from the Tenth Court of Appeals in Waco pursuant to a docket equalization order issued by the Supreme Court of Texas. *See* TEX. GOV'T CODE ANN. § 73.001.

trial in favor of appellee and cross-appellant Gloria Walker a/k/a Mickey Walker.[2] In four issues, which we reorder, Byron argues the trial court erred in: (1) disregarding the jury's finding that he was entitled to specific performance of Gloria's contractual obligations; (2) submitting a jury question concerning whether Gloria released Byron from his obligation to pay Gloria's home equity loan; (3) submitting a jury question regarding ownership of an automobile; and (4) failing to apply a settlement credit to Gloria's monetary award.

In two cross-issues, Gloria argues the trial court erred in: (1) assessing attorney's fees against Walker Ranch, LLC (Walker Ranch)[3] and not Byron; and (2) failing to award prejudgment interest on her breach-of-contract damages. We affirm.

## I. BACKGROUND

### A. Pleadings

Byron sued his mother Gloria for breach of contract.[4] His primary complaint concerned ownership of a license to purchase tickets at the National Finals Rodeo (NFR) hosted annually by Las Vegas Events (LVE). Byron alleged that he and Gloria reached an agreement in 2018 requiring Gloria to transfer ownership of the license to Byron. As part of the consideration, Byron agreed that Gloria could use a Cadillac owned by Walker Ranch. According to Byron's petition, Gloria signed an LVE transfer form, but she later told an LVE representative to leave the license in her name. Byron sought specific performance of the contract, namely that Gloria transfer the NFR license to Byron. In the

---

[2] We refer to the Walker parties by their first names to avoid confusion.

[3] Walker Ranch, LLC, a party to the underlying proceedings, has not filed a notice of appeal.

[4] Byron also brought claims for conversion, fraud, negligent misrepresentation, contribution against an LLC member, and declaratory relief. These claims are not at issue in this appeal.

alternative, Byron prayed that the Cadillac be returned to him or Walker Ranch.[5]

Gloria countersued Byron, asserting claims for misappropriation of Gloria's identity, violations of the Texas Deceptive Trade Practices Act and the Texas Theft Liability Act, conversion, fraud, breach of contract, and declaratory relief. Gloria, an eighty-year-old widow, alleged generally that Byron repeatedly took advantage of her financially. In particular, Gloria asserted that Byron conspired with a bank employee to "defraud [Gloria] into mortgaging her homestead property."[6] Gloria alleged that Byron breached a 2014 oral contract in which Byron promised to pay sixty-three percent of her home equity loan. Gloria sought a declaration that the LVE transfer agreement was forged and of no force or effect.

Walker Ranch separately brought claims against Gloria seeking a declaration that that it is the title owner of the Cadillac. Walker Ranch also sought contribution from Gloria to pay the company's debts. Gloria filed a counterclaim against Walker Ranch, seeking declarations that she is the rightful owner of the Cadillac as it was a Mother's Day gift and that she is not responsible for Walker Ranch's debts.

Gloria later filed a third-party petition against First State Bank (FSB) and its president Michael Montgomery. Gloria alleged that Montgomery and FSB conspired with Byron to "pressure and manipulate [Gloria] into taking out a $200,000 home equity loan" to satisfy the debts of Byron and Walker Ranch.

---

[5] Byron, Gloria, and Byron's wife, Mary Walker, are members of Walker Ranch.

[6] Gloria also claimed that Byron forged her signature to purchase farm equipment, obtained a credit card in Gloria's name, and failed to return certain firearms. These claims are not at issue in the appeal.

**B. Settlements**

Prior to trial, Gloria settled her claims against Montgomery and FSB. She previously settled claims filed in a separate cause against Lawyer's Title concerning its role in distributing the home equity loan proceeds.

**C. Trial**

**1. Walker Ranch Formation and Purchases**

Byron, a retired professional steer wrestler, formed Walker Ranch in 2008 to purchase an "RV horse trailer" for his son Reagon Walker's rodeo competitions. The company later acquired multiple vehicles and horses. After Reagon's death in 2011, Byron operated Walker Ranch to support the rodeo activities of Byron's wife Mary, a professional barrel racer. Byron, Mary, and Gloria own the company in equal interests.

On Mother's Day 2011, Byron and Mary presented Gloria with a 2011 Cadillac. Byron purchased the vehicle using a Walker Ranch check. The notation on the check read "Mom's Car." The vehicle bore a personalized license plate reading "Mommer," which was Reagon's name for Gloria. Gloria testified that Mary and Byron arrived at her home that morning driving the Cadillac. According to Gloria, they told her the vehicle was a Mother's Day present in memory of Reagon. She stated that the gift was accompanied by a Mother's Day card. Three additional witnesses testified that Byron said he gifted the vehicle to Gloria. Byron maintained that the vehicle was owned by Walker Ranch and it was provided to Gloria for her use only. He introduced evidence that Walker Ranch held title to the vehicle.

Prior to 2013, Byron took out multiple loans from FSB to finance Walker Ranch's

4

operations. In 2013, FSB was unwilling to loan Byron further money. At that time, Byron, Gloria, and Montgomery discussed the possibility of Gloria applying for a loan instead. In October of 2013, the bank issued a $60,000 loan with a two-month maturity date to Gloria. The proceeds were used to finance Walker Ranch's continued operations. According to Montgomery, Byron intended to pay the loan balance with Mary's anticipated winnings from the 2013 NFR. When Mary's winnings proved insufficient, FSB renewed the loan in January of 2014 for an additional six months.

### 2. Home Equity Loan & 2014 Agreement

In April 2014, Montgomery stated that Byron and Gloria "were working together with the bank" to come up with a solution to pay off the loan. The three discussed the possibility of a home equity loan secured by Gloria's homestead. Gloria agreed to this suggestion and applied for a $200,000 thirty-year home equity loan.

FSB approved the application, and the loan closed on August 21, 2014. According to the closing documents, $63,156.16 of the loan proceeds was used to satisfy the earlier FSB loan and $77,692.37 was apportioned to settlement charges and to pay Gloria's outstanding credit card debt. After accounting for additional nominal fees, $59,259.14 of the loan proceeds remained. According to Montgomery, those funds were distributed as follows: (1) $10,000 to Byron and Mary's joint account; (2) $20,000 to Walker Ranch accounts; (3) $18,350.97 to pay interest on Walker Ranch debt; (4) $3,369.99 to pay interest on Byron's personal debt; (5) $3,213.38 to pay interest on the debt of another company co-owned by Byron; and (6) $4,000 to an account jointly held by Byron and

5

Gloria.[7]

Montgomery testified that Byron and Gloria reached an oral agreement requiring Byron to pay sixty-three percent of the loan. More particularly, Byron agreed to pay sixty-three percent of the monthly payment attributable to principal and interest. Gloria similarly testified that Byron agreed to pay his share of the loan. Although she could not recall the precise share, she stated that Byron's past monthly payment of $676 represented his monthly obligation. Byron affirmed that he agreed to pay "my part" of the home equity loan, and he agreed that this amounted to sixty-three percent of the loan.

The trial court admitted into evidence the settlement and release agreement between Gloria and Lawyer's Title. While testifying that he was responsible to pay his "part" of the note, Byron alternatively contended that Gloria released any claims against him regarding the home equity loan as part of the settlement agreement.

At the time of trial, Byron had contributed $8,112 out of a total of $65,116.36 in payments made toward the loan's principal and interest. Byron made his last payment in February of 2016. Byron maintained that he intended to satisfy his entire obligation when he sold his "rodeo arena" property. At the time of trial, he had not listed the property for sale. Byron claimed that two separate realtors came to look at the property, but Gloria called the police each time.[8] As a result, Byron stated the realtors were not interested in listing the property.

---

[7] These distributions total $58,934.34. As noted above, Gloria previously settled a suit with Lawyer's Title disputing their handling of the loan proceeds.

[8] Gloria's residence is located on land adjoining Byron's property.

### 3.    NFR License

Gloria and her husband Bob Walker co-owned a license to purchase four seats at the annual NFR. After Bob passed in 1999, Gloria became the sole owner of the NFR license. In 2012, Gloria added Byron as a joint account holder by filing a form with LVE. Byron attended the NFR annually through 2016.

Tim Keener, vice president for LVE, testified by deposition. He stated that Gloria contacted LVE on September 21, 2015, claiming that the form adding Byron to the account was fraudulent and that she wanted to remove him. Keener told Gloria that both she and Byron would need to submit a form to accomplish this. On October 24, 2016, LVE received two notarized forms. The first form, signed by Byron and Gloria, transferred the NFR license back to Gloria solely. The second form, signed by Gloria, willed the NFR license to Gloria's daughter Teddi Duval. Gloria permitted Byron to attend the 2016 NFR, but Teddi began using the license thereafter.

Byron testified that he signed the October 24, 2016 form with the understanding that Gloria would permit him to attend the NFR each year. He maintained that Gloria instead allowed Teddi to use the license in 2017. Byron stated that his friends sent him a picture of someone he considered to be a bitter rival sitting in his seat at that year's rodeo. For this reason, Byron demanded that Gloria no longer use the Cadillac.

### 4.    2018 Agreement

Byron testified that he reached an oral agreement with Gloria on March 8 or 9, 2018, with the following terms: (1) Gloria will return Reagon's guns to Byron; (2) Byron will allow Gloria to use the Cadillac; (3) Gloria will assign the NFR ticket license back to

7

Byron; and (4) Byron will pay his part of the home equity loan "when [his] property that [he] own[s] at the arena sells."

Byron testified that he and a notary arrived at Gloria's house on March 10, to have Gloria sign an NFR license transfer form. According to Byron, Gloria signed the form.[9] Lauren Rainbolt, the notary in question, similarly testified that she witnessed Gloria sign the form. The trial court admitted into evidence the transfer form, purportedly bearing Gloria's notarized signature.

Byron testified that Gloria wrote the terms of their oral agreement on stationary paper. The trial court admitted a copy of the writing[10] which reads as follows: "Gave [illegible] guns. Car myself. I will give him tickets to NFR and he will pay my note at the Bank when he sells land at his [crossed-out term] & arena." Byron's notarized signature appears on the document. The writing was not signed by Gloria. Byron stated that the written agreement originally provided that his payment of the home equity loan was conditioned upon "when he sells land at his home & arena." Byron testified that he crossed out the word "home." Byron conceded that he had no evidence that Gloria consented to altering the agreement.

Gloria disputed the authenticity of the 2018 LVE transfer form.[11] She further denied writing the document memorializing her purported agreement with Byron. She

---

[9] Gloria also signed a document granting Byron an easement over a certain part of Gloria's property. The easement is not at issue in this appeal.

[10] The copy of the writing was presented as a still frame from a video taken by Byron.

[11] During examination by Byron's counsel, Gloria seemingly asserted that the March 2018 form was authentic. She later clarified that she was referring to 2012 form adding Byron to the account.

claimed to have never seen it. Keener testified that he called Gloria about the March 10 transfer form and that she confirmed it was authentic. However, Gloria later told Keener that she did not want to go through with the transfer.

## C.     Verdict & Judgment

The pertinent jury questions and corresponding answers are as follows:[12]

### QUESTION NO. 1.

On March 10, 2018, did Byron Walker and Gloria Walker enter into a binding contract?

. . . .

ANSWER: Yes.

. . . .

### QUESTION NO. 2

Did Gloria Walker fail to comply with the contract?

. . . .

ANSWER: Yes.

. . . .

### QUESTION NO. 3

Is Byron Walker entitled to specific performance of the contract which means transfer of the NFR season tickets to him?

. . . .

ANSWER: Yes.

. . . .

---

[12] We omit the definitional portions of the jury questions for brevity as they are not pertinent to the issues in this appeal. *See* TEX. R. APP. P. 47.1.

## QUESTION NO. 5.

What is a reasonable fee for the necessary services of Byron Walker's attorneys for bringing his claim that Gloria Walker failed to comply with the contract?

. . . .

ANSWER: $77,000.00

. . . .

## QUESTION NO. 6.

Which of the following do you find should be awarded ownership of the 2011 [Cadillac]?

Check only one of the following:

    a. Gloria Walker        x
    b. Byron Walker        ___
    c. Mary Walker        ___
    d. Walker Ranch, LLC    ___

. . . .

## QUESTION NO. 7.

. . . .

What is a reasonable fee for the necessary services of such party's attorneys in claiming ownership of the 2011 [Cadillac]?

. . . .

ANSWER: $34,828.10

. . . .

## QUESTION NO. 8.

Did Byron Walker fail to comply with the 2014 contract to pay his share of the Home Equity Loan?

. . . .

ANSWER: Yes.

. . . .

## QUESTION NO. 9.

Did Gloria Walker release Byron Walker from any part of his promise to pay his share of the Home Equity Loan?

. . . .

ANSWER: No.

. . . .

## QUESTION NO. 10.

Did Gloria Walker waive her right to bring the breach of contract claim regarding the 2014 contract?

. . . .

ANSWER: No.

. . . .

## QUESTION NO. 11.

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Gloria Walker for her damages, if any, that resulted from Byron Walker's failure to comply with the contract?

. . . .

ANSWER: $152,500

. . . .

## QUESTION NO. 12.

What is a reasonable fee for the necessary services of Gloria Walker's

11

attorneys on her claim that Byron Walker failed to pay his share of the Home Equity Loan?

ANSWER: $41,446.70

. . . .

Byron filed a motion for judgment notwithstanding the verdict (JNOV), arguing that the trial court should disregard the jury's answers to questions 7, 11, and 12. Byron maintained there was no legal basis for the award of attorney's fees in relation to the Cadillac finding. Byron further argued that the jury's damage finding for Gloria's breach-of-contract claim would cause Gloria to obtain a double recovery for her injuries. Byron petitioned the trial court to apply a settlement credit to the award based on Gloria's prior settlements with FSB and Lawyer's Title. Finally, Byron argued that the jury's award of attorney's fees for Gloria's breach of contract claim must be disregarded because Gloria failed to plead and prove presentment of the claim.

Gloria moved for JNOV regarding the jury's finding that Byron and Gloria entered into a binding contract on March 10, 2018. Gloria argued that there was no evidence of an enforceable contract. Gloria asserted that the alleged terms were not clear and definite. She also pointed out that Byron crossed out a material term of the contract, requiring him to pay off the home equity loan when he sold his house. Gloria further maintained that Byron failed to establish the portion of the home equity loan that he agreed to pay, citing Byron's equivocal testimony on that issue. Next, Gloria argued that the contract was not supported by consideration, as she was already gifted the Cadillac and Byron previously promised to pay a portion of the home equity loan.

Gloria also moved for JNOV on the jury's finding that Byron was entitled to specific

12

performance of the contract. She argued there was no evidence that Byron was ready, willing, and able to perform his obligations under the contract, and therefore he was not entitled to specific performance.

The trial court held multiple hearings regarding the parties' post-verdict motions. During those proceedings, the trial court admitted Gloria's settlement agreements into the record for purposes of considering Byron's request for a settlement credit. The agreements reflect that Gloria received $110,000 from FSB and $40,000 from Lawyer's Title.

By letter, the trial court notified the parties that it was granting Gloria's JNOV regarding Byron's specific performance claim for possession of the NFR license. The trial court explained that "Question No. 1 does not define the terms of the 'contract' which is to be specifically enforced and it is not possible for the [trial c]ourt to do so in retrospect, both practically and legally." The trial court denied the parties' motions in all other respects. The final judgment ordered that Byron take nothing on his claims. The judgment declared that Gloria was the rightful owner of the Cadillac and granted Gloria $34,828.10 in attorney's fees to be assessed against Walker Ranch. The judgment awarded Gloria $152,500[13] for her breach-of-contract claim against Byron, $41,446.70 in attorney's fees, court costs, and post-judgment interest. Byron filed a motion for new trial, which the trial court denied. Both parties appeal.

---

[13] In entering judgment in full on the jury's damage finding, the trial court implicitly denied Byron's application to apply a settlement credit.

## II.    JNOV

### A.    Standard of Review

A trial court may grant a JNOV motion only if a directed verdict would have been proper, and it may disregard a jury finding only if the finding is unsupported by evidence or the finding is immaterial. *See* TEX. R. CIV. P. 301; *USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 505 (Tex. 2018) (citing *Spencer v. Eagle Star Ins. Co. of Am.*, 876 S.W.2d 154, 157 (Tex. 1994)); *Davis v. Nat'l Lloyds Ins. Co.*, 484 S.W.3d 459, 467 (Tex. App.—Houston [1st Dist.] 2015, pet. denied). A jury finding is immaterial when the corresponding question either: (1) should not have been submitted; (2) calls for a finding beyond the province of the jury, such as a question of law; or (3) was properly submitted but has been rendered immaterial by other findings. *Se. Pipe Line Co. v. Tichacek*, 997 S.W.2d 166, 172 (Tex. 1999); *Spencer*, 876 S.W.2d at 157.

"We review a trial court's decision to grant or deny . . . a motion for JNOV under the legal sufficiency standard of review." *Mikob Props., Inc. v. Joachim*, 468 S.W.3d 587, 594 (Tex. App.—Dallas 2015, pet. denied); *see City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex. 2005) ("[T]he test for legal sufficiency should be the same for summary judgments, directed verdicts, [JNOVs], and appellate no-evidence review."). In conducting our review, we must credit evidence favoring the jury verdict if a reasonable juror could, and we disregard contrary evidence unless reasonable jurors could not. *Tanner v. Nationwide Mut. Fire Ins. Co.*, 289 S.W.3d 828, 830 (Tex. 2009).

Evidence is legally insufficient if: (1) there is a complete absence of evidence of a vital fact; (2) the trial court is barred by the rules of law or evidence from giving weight to

14

the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is not more than a scintilla; or (4) the evidence conclusively establishes the opposite of a vital fact. *City of Keller*, 168 S.W.3d at 810. More than a scintilla of evidence exists if the evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004) (quoting *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997)). If more than a scintilla of evidence supports the jury's finding, "the jury's verdict[,] and not the trial court's judgment[,] must be upheld." *Wal-Mart Stores, Inc. v. Miller*, 102 S.W.3d 706, 709 (Tex. 2003) (per curiam).

## B. Specific Performance

By his first issue, Byron argues the trial court erred in granting Gloria's motion for JNOV with respect to the jury's finding that Byron was entitled to specific performance for transfer of the NFR license. Byron argues that there was evidence that he was ready, willing, and able to perform his obligations of the 2018 agreement, and therefore, he was entitled to specific performance. We note, however, that the trial court granted Gloria's motion for JNOV for a different reason—that it could not determine the terms of the contract purportedly breached. In other words, the trial court concluded that there was no evidence of an enforceable contract.

The elements of a valid contract are: "(1) an offer; (2) an acceptance in strict compliance with the terms of the offer; (3) a meeting of the minds on the essential terms of the contract (mutual assent); (4) each party's consent to the terms; and (5) execution and delivery of the contract with the intent that it be mutual and binding." *E-Learning LLC*

15

*v. AT&T Corp.*, 517 S.W.3d 849, 858 (Tex. App.—San Antonio 2017, no pet.). "An acceptance must not change the terms of an offer; if it does, the offer is rejected." *Coleman v. Reich*, 417 S.W.3d 488, 491 (Tex. App.—Houston [14th Dist.] 2013, no pet.). "A material change in a proposed contract constitutes a counteroffer, which must be accepted by the other party for there to be a valid contract." *Id.* A contract must be sufficiently definite in its terms to be enforceable. *Lloyd Walterscheid & Walterscheid Farms, LLC v. Walterscheid*, 557 S.W.3d 245, 258 (Tex. App.—Fort Worth 2018, no pet.). Whether an agreement constitutes an enforceable contract is a question of law which we review de novo. *Meru v. Huerta*, 136 S.W.3d 383, 390 (Tex. App.—Corpus Christi–Edinburg 2004, no pet.); *see Martin v. Martin*, 326 S.W.3d 741, 747 (Tex. App.—Texarkana 2010, pet. denied).

At trial, Byron maintained that the handwritten March 10, 2018 document memorialized his earlier oral agreement with Gloria. *See Yasuda Fire & Marine Ins. Co. of Am. v. Criaco*, 225 S.W.3d 894, 899 (Tex. App.—Houston [14th Dist.] 2007, no pet.) ("[E]ven in the absence of an express merger clause, all prior oral and written agreements are presumed to merge into a subsequent written contract."). As set out above, the writing reads as follows: "Gave [illegible] guns. Car myself. I will give him tickets to NFR and he will pay my note at the Bank when he sells land at his [crossed-out term] & arena." Only Byron's signature appears on the document. Byron stated that the writing originally stated that his payment of the note was conditioned upon "when he sells land at his home & arena" but that he crossed out the word "home."

We conclude that Byron changed a material term of the purported agreement by

16

crossing out the word "home." Byron's unilateral alteration of the contract's terms constituted a rejection of the agreement and a counteroffer to Gloria. *See Reich*, 417 S.W.3d at 491. Furthermore, Byron presented no evidence that Gloria accepted the counteroffer, such as by signing it after the alteration was made. *See Arshad v. Am. Express Bank, FSB*, 580 S.W.3d 798, 804 (Tex. App.—Houston [14th Dist.] 2019, no pet.) ("Evidence of mutual assent in written contracts generally consists of signatures of the parties and delivery with the intent to bind."). Accordingly, we hold that there is no evidence of acceptance in strict compliance with the terms of the offer, a necessary element for an enforceable contract.[14] *See E-Learning LLC*, 517 S.W.3d at 858. Because there was legally insufficient evidence supporting Byron's claim, the trial court did not err in granting Gloria's motion for JNOV. *See Joachim*, 468 S.W.3d at 594. Based on our resolution of this issue, we necessarily reject Byron's dependent argument that the trial court erred in failing to award attorney's fees for Byron's claim. We overrule Byron's first issue.

## C.    Release

In his second issue, Byron argues that "[t]he [t]rial [c]ourt erred in submitting Question No. 9 that Gloria did not release Byron in the Lawyer's Title settlement document because the release, being unambiguous, should have been found in the affirmative as a matter of law." We construe Byron's argument as a complaint that the jury's finding was immaterial and should be disregarded. *See Tichacek*, 997 S.W.2d at 172 (explaining that a jury finding is immaterial when the corresponding question, among other things, calls

---

[14] The record reflects that Byron later sold his house, but he did not apply any of the proceeds to the home equity loan.

for a finding beyond the province of the jury, such as a question of law).

We note that Byron did not object to the submission of this question. However, a complaint that a jury's answer is immaterial is not a jury-charge complaint which must be raised before the jury deliberates. *Musallam v. Ali*, 560 S.W.3d 636, 640 (Tex. 2018). Nevertheless, a party must still preserve a materiality complaint, and it may do so by raising the issue in a motion for JNOV, a motion to disregard the finding, or a motion for new trial. *Orr v. Broussard*, 565 S.W.3d 415, 421 (Tex. App.—Houston [14th Dist.] 2018, no pet.) (citing *see BP Am. Prod. Co. v. Red Deer Res., LLC*, 526 S.W.3d 389, 402 (Tex. 2017)); *see* TEX. R. APP. P. 33.1(a)(1). Here, Byron did not argue in the trial court that Question No. 9 was immaterial because it presented a legal question to the jury. Therefore, he has not preserved the issue for appellate review. *See* TEX. R. APP. P. 33.1(a)(1); *Orr*, 565 S.W.3d at 421. We overrule Byron's second issue.

## D.    Ownership of Cadillac

In his third issue, Byron argues "[t]he [t]rial [c]ourt erred in submitting Question 6 as to ownership of the Cadillac . . . and likewise awarding Gloria attorney's fees per Question 7." Byron maintains that the "ownership issue was already before the [t]rial [c]ourt in Byron's breach of contract case as part of the consideration for the transfer of the NFR tickets[.]" Therefore, Byron argues that declaratory judgment was an improper vehicle to obtain attorney's fees. We construe Byron's issue as challenging the trial court's denial of his motion for JNOV on the attorney fee's award, in which he raised a similar argument. *See Hong Kong Dev., Inc. v. Nguyen*, 229 S.W.3d 415, 452 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (holding that appellant preserved legal challenge to

18

award of attorney's fees in declaratory judgment action by raising the argument in a motion for JNOV).[15]

The purpose of the Uniform Declaratory Judgment Act (UDJA) "is to settle and to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations; and it is to be liberally construed and administered." TEX. CIV. PRAC. & REM. CODE ANN. § 37.002(b). Under the UDJA, the trial court "may award costs and reasonable and necessary attorney's fees as are equitable and just." Id. § 37.009. "[S]imply repleading a claim as one for a declaratory judgment cannot serve as a basis for attorney's fees, since such a maneuver would abolish the American Rule and make fees 'available for all parties in all cases.'" Etan Indus., Inc. v. Lehmann, 359 S.W.3d 620, 624 (Tex. 2011) (per curiam) (quoting MBM Fin. Corp. v. Woodlands Operating Co., 292 S.W.3d 660, 669 (Tex. 2009)). "When a claim for declaratory relief is merely 'tacked onto' statutory or common-law claims that do not permit fees, allowing the UDJA to serve as a basis for fees 'would violate the rule that specific provisions should prevail over general ones.'" Id. (quoting MBM Fin. Corp., 292 S.W.3d at 670). In other words, the declaratory judgment claim must do more than duplicate the issues presented by claims already

---

[15] Byron does not argue that declaratory relief is an improper remedy for Gloria's ownership claim except to say that it duplicated the issues already raised by Byron's claims and thus could not serve the basis for an attorney fee award. Further, Byron did not argue in the trial court, and he does not argue on appeal, that there is legally insufficient evidence supporting the jury's finding that Gloria is the rightful owner of the Cadillac. Therefore, these issues are not before us.

We further note that the trial court assessed attorney's fees for this claim against Walker Ranch, which, as mentioned in footnote 3, has not filed a notice of appeal in this case. "Texas courts have long held that an appealing party may not complain of errors that do not injuriously affect it or that merely affect the rights of others." Torrington Co. v. Stutzman, 46 S.W.3d 829, 843 (Tex. 2000); see Jackson v. Fontaine's Clinics, Inc., 499 S.W.2d 87, 92 (Tex. 1973) (appealing defendant could not complain of alleged error in judgment against non-appealing co-defendants). Nevertheless, because Gloria argues in her cross-appeal that the attorney's fees should be assessed against Byron, we address the merits of Byron's claim that the attorney fee award was improper.

before the court. *Id.*

Byron's breach-of-contract claim sought to enforce the terms of the alleged 2018 contract between himself and Gloria. On the other hand, Gloria disavowed any such contract. Rather, she claimed ownership of the Cadillac on a different legal basis—that Byron gifted her the Cadillac for Mother's Day in 2011.[16] Further, Gloria's claim for declaratory relief was a counterclaim filed against Walker Ranch, which sought a similar declaration. Thus, Gloria's claim was not merely "tacked onto" Byron's breach of contract claim. *See Transcor Astra Grp. S.A. v. Petrobras Am. Inc.*, No. 20-0932, 2022 WL 1275238, at *14 (Tex. Apr. 29, 2022) (concluding that a counterclaim did not merely duplicate plaintiff's claim because the counterclaim sought additional relief). Accordingly, we conclude that the trial court did not err in denying Byron's motion for JNOV regarding this claim. *See Joachim*, 468 S.W.3d at 594. We overrule Byron's third issue.

## III.     ONE-SATISFACTION RULE

By his fourth issue, Byron argues that the trial court erred in failing to apply a settlement credit to the judgment against Byron, thereby violating the one-satisfaction rule.

## A.     Standard of Review & Applicable Law

"Under the one[-]satisfaction rule, a plaintiff is entitled to only one recovery for any damages suffered." *Sky View at Las Palmas, LLC v. Mendez*, 555 S.W.3d 101, 106 (Tex.

---

[16] "To establish the existence of a valid *inter vivos* gift, the plaintiff must show[:] (1) that the donor intended to make a gift; (2) delivery of the property; and (3) acceptance of the property by the donee." *Gomer v. Davis*, 419 S.W.3d 470, 476 (Tex. App.—Houston [1st Dist.] 2013, no pet.) (citing *Nipp v. Broumley*, 285 S.W.3d 552, 558 (Tex. App.—Waco 2009, no pet.) and *Edwards v. Pena*, 38 S.W.3d 191, 197 (Tex. App.—Corpus Christi–Edinburg 2001, no pet.)).

20

2018) (quoting *Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 379, 390 (Tex. 2000)). The rule applies when multiple defendants commit the same acts, or when multiple defendants commit technically different acts that result in a single injury. *Casteel*, 22 S.W.3d at 390. "[T]he fundamental consideration in applying the one[-]satisfaction rule is whether the plaintiff has suffered a single, indivisible injury—not the causes of action the plaintiff asserts[.]" *Sky View*, 555 S.W.3d. at 107. "[T]he nonsettling defendant is entitled to offset any liability for joint and several damages by the amount of common damages paid by the settling defendant, but not for any amount of separate or punitive damages paid by the settling defendant." *Casteel*, 22 S.W.3d at 391–92.

"A nonsettling defendant seeking a settlement credit under the one-satisfaction rule has the burden to prove its right to such a credit." *Sky View*, 555 S.W.3d. at 107. "[A] nonsettling defendant meets this burden by introducing into the record either the settlement agreement or some other evidence of the settlement amount." *Id*. If the nonsettling party meets their burden, then burden shifts to the plaintiff to show "the extent to which the settlement amounts were allocated to separate damages caused by the settling defendants as opposed to joint or common damages." *Elness Swenson Graham Architects, Inc. v. RLJ II-C Austin Air, LP,* 520 S.W.3d 145, 163 (Tex. App.—Austin 2017, pet. denied) (citing *Galle, Inc. v. Pool*, 262 S.W.3d 564, 572 (Tex. App.—Austin 2008, pet. denied)); *see Casteel*, 22 S.W.3d at 91–92. The plaintiff can meet its burden by presenting evidence showing "that entering judgment on the jury's award would not provide for the plaintiff's double recovery." *Sky View*, 555 S.W.3d. at 107–08. "If the plaintiff fails to satisfy this burden, then the nonsettling party is entitled to a credit equaling

21

the entire settlement amount." *Elness*, 520 S.W.3d at 163. We review the trial court's application of the one satisfaction rule de novo. *Sky View*, 555 S.W.3d. at 108.

**B.    Analysis**

In seeking a settlement credit, Byron introduced into evidence Gloria's settlement agreements with Lawyer's Title for $40,000 and FSB for $110,000. The parties agree that each settlement related to claims arising out of the 2014 home equity loan taken out by Gloria in the amount of $200,000. Similarly, Gloria's claim against Byron for breach of contract relates to his obligation to pay a portion of the home equity loan. We assume, for the sake of argument, that the three awards relate to a single, indivisible injury. *See id.* at 107. We nevertheless conclude that Gloria met her burden to show that entering judgment on the jury's award would not provide for a double recovery. *See id.* at 107–08.

Gloria presented evidence that $64,405.48 of the settlement proceeds were paid to her attorneys, while Gloria received $85,594.52. Because Gloria's attorney's fees in relation to those claims do not constitute joint or common damages, we conclude that only $85,594.52 can be considered as a settlement credit. *See Elness*, 520 S.W.3d at 163. We must next determine the injury against which the settlement credit should be applied. Gloria's judgment against Byron represents his obligation to pay sixty-three percent of the loan principal and interest—not Gloria's entire indebtedness. Thus, in keeping with the fundamental consideration of the one-satisfaction rule, we conclude that the settlement credit must be assessed against Gloria's entire injury. In that regard, Gloria presented evidence that at the time of trial the total principal and accumulated interest on her home equity loan totaled $255,000. Applying the $85,594.52 settlement credit to this

amount leaves $169,405.48 in damages for which Gloria has not been compensated. Because this figure exceeds the damages assessed against Byron, we conclude that Gloria met her burden to show "that entering judgment on the jury's award would not provide for the plaintiff's double recovery." *Sky View*, 555 S.W.3d. at 107–08. Accordingly, the trial court did not err in denying Byron a settlement credit under the one-satisfaction rule. *See id.* at 108. We overrule Byron's fourth issue.

## IV.    CROSS-ISSUES

### A.    Attorney's Fees

In her first cross-issue, Gloria argues the trial court abused its discretion in assessing attorney's fees for her UDJA claim against Walker Ranch instead of Byron.

The UDJA provides that "the court may award costs and reasonable and necessary attorney's fees as are equitable and just." TEX. CIV. PRAC. & REM. CODE ANN. § 37.009. We review the trial court's award of attorney's fees under the UDJA for an abuse of discretion. *Allstate Ins. Co. v. Irwin*, 627 S.W.3d 263, 270–71 (Tex. 2021). A trial court abuses its discretion by awarding fees when there is insufficient evidence that the fees were reasonable and necessary, or when the award is inequitable or unjust. *Bocquet v. Herring*, 972 S.W.2d 19, 21 (Tex. 1998).

The trial court included in the final judgment a declaration that Gloria was the rightful owner of the Cadillac, and it awarded attorney's fees in the amount of $34,828.10 against Walker Ranch. Gloria argues that it was "manifestly unjust and inequitable" to not assess the fees against Byron. We note that Gloria and Walker Ranch filed competing claims for declaratory relief against each other concerning ownership of the Cadillac.

23

Gloria did not bring such a claim against Byron. Further, while Byron sought a declaration that the 2018 agreement was "valid and enforceable," he did not seek a declaration that he is the owner of the vehicle. Because Gloria did not bring her declaratory judgment claim against Byron and Byron did not pursue such a claim against Gloria, there exists no basis to support an award of attorney's fees against Byron. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 37.004, .009; *see also Handwerker Hren Legal Search, Inc. v. Recruiting Partners GP, Inc.*, No. 03-13-00239-CV, 2015 WL 4999054, at *7 (Tex. App.—Austin Aug. 19, 2015, pet. denied) (mem. op.) (concluding that the trial court abused its discretion in awarding attorney's fees against parties jointly and severally, where one of the parties was not a defendant to the declaratory judgment action and did not bring its own claim seeking declaratory relief.). Therefore, we conclude that the trial court did not abuse its discretion in assessing attorney's fees for this claim solely against Walker Ranch. *See Irwin*, 627 S.W.3d at 270–71. We overrule Gloria's first cross-issue.

## B.    Prejudgment Interest

In her second cross-issue, Gloria argues that the trial court erred by not awarding Gloria prejudgment interest on her breach-of-contract damages.

"Prejudgment interest is compensation allowed by law . . . for lost use of . . . money due as damages during the lapse of time between the accrual of the claim and the date of judgment." *Ventling v. Johnson*, 466 S.W.3d 143, 153 (Tex. 2015) (quoting *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 528 (Tex. 1998)). "Texas law provides two legal sources for prejudgment interest: (1) general principles of equity and (2) enabling statutes." *Trevino v. City of Pearland*, 531 S.W.3d 290, 297 (Tex. App.—

24

Houston [14th Dist.] 2017, no pet.) (citing *Johnson & Higgins*, 962 S.W.2d at 528). "Because [a] breach-of-contract claim does not fall within any enabling statute, equitable principles govern the award of prejudgment interest." *Id*. (citing *Hand & Wrist Ctr. of Hous., P.A. v. Republic Servs., Inc.*, 401 S.W.3d 712, 717 (Tex. App.—Houston [14th Dist.] 2013, no pet.)). "[W]here prejudgment interest is sought at common law as an element of the damages, a plaintiff must plead for it." *Bufkin v. Bufkin*, 259 S.W.3d 343, 358 (Tex. App.—Dallas 2008, pet. denied). "A prayer for general relief does not suffice." *Id*.; *see also Michelena v. Michelena*, No. 13-16-00349-CV, 2020 WL 1303234, at *8 (Tex. App.—Corpus Christi–Edinburg Mar. 19, 2020, pet. denied) (mem. op.).

Gloria's live pleading prays for damages, declaratory relief, attorney's fees, costs, and "all other and further relief to which she may be justly entitled." However, Gloria did not specifically request an award of prejudgment interest. Accordingly, we conclude that the trial court did not err in declining to award such. *See Bufkin*, 259 S.W.3d at 358 (holding that plaintiff did not plead for prejudgment interest where the request was not specifically listed and the plaintiff generally prayed for "such other and further relief, general or special, legal or equitable, to which she may show herself justly entitled to receive"). We overrule Gloria's second cross-issue.

## V.     CONCLUSION

We affirm the trial court's judgment.

LETICIA HINOJOSA
Justice

Delivered and filed on the
2nd day of June, 2022.